Miller vs. Jones, adm'r.

---

## MILLER VS. JONES, ADM'R.

1. EVIDENCE: *When plaintiff incompetent to prove account against deceased party.*

Under the rule prohibiting a party from testifying as to transactions between himself and a deceased party, a plaintiff is incompetent to prove an account founded upon such a transaction.

22

2. ————: *Proof of handwriting by comparison.*

Proof of handwriting may be made by comparison, by the jury, of the writing to be proven with other writings, admitted to be genuine, already in the case; but a comparison with writings not already in the case, is not admissible.

3. ————: *Effect of failure to produce when in party's power.*

The non-production of evidence clearly within the power of a party, creates a strong presumption that if produced, it would be against him.

APPEAL from *Woodruff* Circuit Court.

Hon. J. N. CYPERT, Circuit Judge.

*Coody*, for appellant.

*Turner, contra.*

HARRISON, J.:

This was an action brought by Alexander Miller against J. C. McAfee for rent of land, in which at the commencement an attachment was sued out to enforce a landlord's lien, and levied on a portion of the crop.

The defendant filed an answer to the complaint and denied the renting of the land and every material allegation; and he also filed a motion and affidavit to discharge the attachment.

The defendant afterwards dying the cause was revived against A. W. Jones, his administrator.

The case was tried by a jury which found a verdict for the defendant. The plaintiff moved for a new trial, which was refused.

The defendant's damages in the attachment were then by agreement settled at $359, and judgment was rendered against plaintiff and his surety in the attachment bond therefor.

The plaintiff appealed.

The plaintiff testified that McAfee occupied the land mentioned in the complaint during the year 1874; that there was sixty-five acres of cleared land on the place, which was worth $6 an acre rent, and that he was promised the crop that was

raised on it that year; but he had not been paid the rent. He further stated that the contract between McAfee and himself, in relation to the renting of the place, was in writing, and he produced and offered to read to the jury the following instrument, to-wit:

"A contract between A. Miller of the first, J. C. McAfee. of the second part: I have this day rented the place he now lives on for the year 1874, for six dollars per acre, and he is to make 2000 rails and put on the fence at $1.75. Fence corners clean out on inside. I am to give twenty-five dollars 'towards the building a house.                                ALEX. MILLER,
    Witness: J. C. BARTLES.              J. C. McAFEE.
    Rents to be settled first, except 2 bales to pay hired hands."

The defendant objected to its admission as evidence, the bill of exceptions says, because it was unintelligible and void, and the court excluded it.

The meaning of the instrument is certainly obscure; but it is, we think, capable of an intelligible construction.

The obvious intention of the parties was a lease, but the difficulty is to determine which of the parties was the lessor and which the lessee, or in other words, to which do the pronouns I and he respectively refer.

But when it is borne in mind that in indentures, which this instrument has something of the form of, the grantor is commonly named the party of the first part, and that a lease which simply conveys the term and states the conditions upon which it is made, is usually a deed poll, or signed by the lessor only, the conclusion can be reasonably arrived at without proof of collateral facts, that Miller, of the first part, was the lessor. This appearing, there was not a patent ambiguity, and if its execution had been proven, it should have been read to the jury. But Bartles, the subscribing witness, though present and a wit-

ness for the defendant, was not called to prove its execution, and although when testifying for the defendant its execution was proven by him, it was not afterwards again offered in evidence.

The plaintiff also offered to prove by his own testimony, that the account exhibited with his complaint was correct, but upon objection by the defendant, was not permitted to do so. The account referred to does not appear in the record, and we are not informed as to its nature or contents, except by the complaint, which refers to it as containing a more particular statement of the plaintiff's demand; and the ground of the objection is not shown. We are therefore unable to say whether it was well taken or not, but must presume the court decided correctly. Most likely, however, it was because of his incompetency to testify as to transactions between himself and the defendant's intestate. If the account stated, or was founded on such a transaction, there can be no question as to the validity of the objection.

The plaintiff then introduced the following witnesses :

J. A. North, who testified, that he rented land from McAfee in 1874, and paid $6 an acre. That he complained to McAfee that the rent was too high, and McAfee said, that Miller was threatening to put him off the land, and if he succeeded in his suit, he would have to pay the same rent to him. He also heard him say, that Miller would not allow him but $25 for a cabin he built.

Green North testified substantially the same, and William North, that he heard McAfee say, that Miller would not allow him more than $25 for the cabin.

R. W. Martin testified: that McAfee told him in the spring of 1874, that his contract with Miller for the purchase of the land had been cancelled, and he had nothing more to do with it, and Miller would have to pay the taxes of 1873. He said he was going to move to Texas or to North Arkansas, but should keep possession that year.

And W. J. Ramsey testified: that in November, 1873, Miller attached some cotton McAfee had at his gin, for rent. That the matter was compromised and McAfee let him have several bales. The weight of the bales was an average of 500 pounds each; and for which Miller allowed him fifteen cents per pound.

The following witnesses were then called by the defendant.

James Felker, who testified, that McAfee purchased the land from Miller in 1866; that he was present and was called upon by them to witness the trade, McAfee was to pay $3000 for the land, $1000 at Christmas, 1866, $1000 at Christmas, 1867, and the other $1000 at Christmas, 1868. That no notes were given by McAfee, and he took no bond for title; but went into possession under his purchase and continued in possession until his death.

——— Nelson, testified: that he lived with Miller in the spring of 1873, and he heard him say about the first of March, that, if McAfee could make the last payment on the land, he could then make him a deed to it; that he had not before been able to do it. This remark was made by Miller soon after he had returned from Augusta, where he had been attending court. That Miller in April that year got some mules from McAfee, which he told witness he took at $225, and witness said to him in the conversation about the mules, that he supposed McAfee was getting along very well towards making the last payment on the land, to which Miller replied: "No; I am only trying to get interest on what he owes me, when that is done I will dispossess him." The land McAfee purchased, Miller purchased from Fugate, and he from King.

James Bartles testified that Miller told him, in December, 1873, that McAfee had paid $2400 on the land, and had also let him have several bales of cotton. He also testified that in the spring of 1874, he witnessed for the parties a contract

between Miller and McAfee, for the rent of the land that year, which was the same the plaintiff offered to read to the jury; and that they gave it to him to keep, and that he retained possession of it until some time in the summer, when, upon urgent request of Miller, he gave it up to him.

Mrs. ———— McAfee testified, that Miller told her that McAfee had paid $2400 on the land, besides the seven bales of cotton he got at Raney's gin, and some money that he had paid to Mrs. King.

The defendant then having proven the same to the satisfaction of the court, read the following instrument of writing and papers to the jury, to-wit:

" $750.   One day after date, I promise to pay Alex. Miller the sum of seven hundred and fifty dollars, for value received of him, this February 28, 1873, with ten per cent. interest from January, 1873.                              J. C. McAFEE."

" February 28th, 1873.

" I, Alex. Miller, am now ready to make the deed to J. C. McAfee, when the payments are made.        ALEX. MILLER."

" February 28th, 1873.

" I have this day let J. C. McAfee hold the place for the present year.   If he does not pay up for the land known as the King land, he is to give up the land.   I agree to give six dollars per acre, and in case the land falls back, A. Miller agrees to pay for improvements that may be necessary to make.  J. C. McAFEE."

" Received of J. C. McAfee:

| | |
|---|---:|
| 1 colt, at $50 | $ 50 |
| 1 pony, $90 | 90 |
| 110 bushels corn, at $1 | 110 |
| To cash | 50 |
| 2 mules | 225 |
| 1 bale cotton | 33 |
| | ——$528 |

" June 15th, 1873.                          ALEX. MILLER."

"April the 8th, 1869.

"Received of J. C. McAfee, ($1200) twelve hundred dollars, in payment for land. ALEX. MILLER."

The genuineness of these papers were proven by J. M. Bonner, who swore he was well acquainted with the handwriting of the plaintiff, and had often seen him write.

The body of the first and third, he said, was in the plaintiff's handwriting, and the signatures in McAfee's.

The plaintiff then called R. W. Martin, who swore that he was familiar with the plaintiff's handwriting, having had dealings with him for several years, and had often seen him write, and that he did not believe the signatures were Miller's, nor that the body of the first (the note,) and third papers were in his handwriting. That the signature to the note was McAfee's, and he believed he wrote the body of the second paper.

The following receipt was then handed him by the defendant:

"Received of J. C. McAfee, two hundred and sixty-seven dollars and twenty-six cents, this 20 November, 1873.

ALEX. MILLER."

Which he said was in the handwriting of the plaintiff, and it was read to the jury.

The defendant also handed him an account, with a receipt attached, signed Miller & Co. By Alex. Miller, the signature to which he said was the plaintiff's.

The plaintiff was recalled, and he denied that he had ever had any conversation with Bartles about McAfee's indebtedness to him, and that he told him, or Mrs. McAfee, that McAfee had paid $2400 on the land.

The defendant having proven by Ed. T. Jones, that he saw the plaintiff write the signature to the receipt attached to the account before shown the witness Martin, he was then permitted, against the objections of the plaintiff, to exhibit to the jury

the signatures to the receipt, and the contract, the execution of which was proven by Bartles, but had been excluded from the jury, and to hand them the papers read in evidence, together with the plaintiff's bond and affidavit for the attachment, containing his genuine signatures, in order that they might compare the handwriting of the same.

It is said by Mr. Greenleaf, that proof of handwriting may be made by a comparison of the writing to be proven, with other writings, admitted to be genuine, already in the case. "The reason assigned for this is," he says, "that as the jury are entitled to look at such writings for one purpose, it is better to permit them, under the advice and direction of the court, to examine them for all purposes, than to embarrass them with impractical distinctions to the peril of the cause." 1 Green. Ev., sec. 578.

But a comparison with writings not already in the case but which are proven for the purpose of such comparison is not admissible. *Van Wyck* v. *McIntosh*, 4 Kernan, 439; *Jackson* v. *Phillips*, 9 Cow., 94; *Doe* v. *Newton*, 5 Adol. & El., 514; *Bromage* v. *Rice*, 7 Carr. & P., 548; *Waddington* v. *Cousins*, Ib., 595.

It was error therefore to allow the papers not in the case to be handed to the jury for a comparison with those read in evidence.

The court refused to give the jury the two following instructions asked by the plaintiff:

"If you find from the evidence that the trade in regard to the purchase of the land, had been rescinded and McAfee occupied the land in 1874, you will find for the plaintiff the value of the rent for that year, unless you also find that McAfee was to remain on the land that year free of rent by contract with the plaintiff.

"A verbal or parol contract for the sale of land is void under the Statute of Frauds, unless it appears that the party took

possession of the same solely and exclusively under the contract of purchase."

It gave five for the defendant to all of which the plaintiff excepted, and it gave the following, also excepted to by the plaintiff, on its own motion.

"If you find from the evidence that McAfee was the tenant of plaintiff under a contract for the year 1874, you will find for the plaintiff the value of the rent as proven, but if you find that the defendant went into possession of the land under a purchase from plaintiff and occupied it. in 1874, only by virtue of his purchase, you will find for the defendant.

"If you find that the trade in regard to the land had been rescinded and McAfee occupied-the land in 1874, you will find for the plaintiff the value of the rent for that year."

The last instruction given by the court on its own motion was more favorable for the plaintiff than the first of those refused, and he has no cause to complain of its rejection.

The jury, it appears from the bill of exceptions, had already been instructed for him, that if they believed from the evidence that the plaintiff rented McAfee the land in 1874, or that McAfee agreed to pay him rent for it that year, to find for the plaintiff the value of the rent, although McAfee might have previously purchased the land from him.

The other was inapplicable to the evidence and was properly refused.  The evidence plainly shows that McAfee obtained possession under the purchase, and there was no evidence whatever to the contrary, or which tended in the least to prove that the possession was not solely and entirely so obtained.

This court has several times declared that it will not review instructions excepted to, as those given for the defendant were, without specification and in gross.  We have, however, examined these and find them unobjectionable, but shall not undertake the unnecessary labor of remarking upon each.

No objection can be seen to the instruction given by the court on its own motion, and the appellant's counsel has not attempted to point out any.

Permitting the jury to compare the handwriting of the several papers read in evidence with the plaintiff's signatures to other papers not in the case, we have seen was an error, yet we think not such as could have affected the verdict or should cause it to be disturbed. The plaintiff, who knew whether the writings were genuine or not, was a witness in his own behalf, and was, after they were read to the jury, recalled and again testified, but he did not deny their genuineness. This was a circumstance so significant and pregnant as to allow no doubt that they were genuine.

The non-production of evidence clearly within the power of a party, creates a strong presumption that, if produced, it would be against him. 1 Green. Ev., sec. 37.

The error in permitting improper testimony to be given to the jury when it could not have prejudiced the party is no cause of reversal, as when the same facts were abundantly proven by other witnesses. *Clinton* v. *Estes,* 20 Ark., 216.

The judgment is affirmed.